UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

GEORGE A. SIMMONS,

                **Plaintiff,**

      v.

**OHIO REHABILITATION
SERVICES COMMISSION, et al.,**

                **Defendants.**

**Case No. 2:12-cv-086
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Terence P. Kemp**

## OPINION AND ORDER

Plaintiff George Simmons, an African American, brings this race discrimination and retaliation action against his previous employer Defendant Ohio Rehabilitation Services Commission ("RSC"), RSC Director Keith Miller, Bureau of Services for the Visually Impaired Assistant Director Steve Moore, and RSC Assistant Manager Lisa Kemp. This matter is before the Court for consideration of Defendants' Motion for Summary Judgment. (ECF No. 24.) For the reasons that follow, the Court **GRANTS** Defendants' motion.

### I.

**A. Background**

**1. RSC's Business Enterprise Program**

Defendant RSC's Business Enterprise Program provides Ohioans who are legally blind with the opportunity to operate cafeterias, snack bars, convenience stores, and vending facilities throughout the state, primarily in federal and state office buildings, colleges and universities, and at highway rest areas. The Business Enterprise Program is a creation of the federal Randolph-Sheppard Program, and is governed by both federal and state laws and regulations.

*See* 20 U.S.C. § 107 *et seq.*; Ohio Rev. Code §§ 3304.28 *et seq.* Ohio's Business Enterprise Program Operators are self-employed entrepreneurs who derive their income from the successful management of the food service facilities. Each prospective Operator completes a comprehensive 16-week training program before becoming licensed.

Once licensed, Operators are provided hands-on assistance in the daily operation of their business by RSC employees, known as Business Enterprise Specialists. The Specialists report to one of two Assistant Managers, who report to the Assistant Deputy Director for the Bureau of Services for the Visually Impaired. The Assistant Deputy Director reports to the Deputy Director for the Bureau of Services for the Visually Impaired, who reports to the Executive Director of RSC.

### 2. Plaintiff's Positions and Supervisors

Plaintiff was hired by RSC in 1979. The last position he held was Specialist. The Ohio Administrative Code sets forth the requirements of the position as follows:

(D) The B[usiness] E[nterprise] supervisor/specialist shall:

(1) Provide the operator with a copy of the business enterprise rules in both written and his/her desired alternative format, and with forms prescribed by the business enterprise central office under rule 3304:1-21-08 of the Administrative Code;

(2) Familiarize the operator with the business enterprise rules, the terms and conditions of the bureau-operator and bureau-grantor agreements for the facility and advise him/her of the requirement to comply with them;

(3) Instruct the operator in the preparation of the reports required by paragraph (A) of rule 3304:1-21-08 of the Administrative Code;

(4) Inform the operator of federal, state, and local laws governing his/her status as a retailer, a self-employed person, and an employer;

(5) Give special assistance to newly licensed operators and operators managing new

2

or remodeled locations;

(6) Perform semi-annual inspections and prepare a written report on a form prescribed by [the Bureau of Services for the Visually Impaired];

(7) Perform an annual performance appraisal, an annual equipment inventory, an annual records review, an annual budget projection, and such facility visits as required to document management and operational deficiencies and to support plans of corrective action;

(8) Advise the operator with respect to business management, record keeping, merchandising, sound retail practices, and maintaining good relations with customers, employees, and suppliers;

(9) Ensure that all facility equipment is maintained in good repair and an attractive condition; and conduct an annual physical inventory of equipment between April and June of each year;

(10) Refer to the operator, persons for employment in accordance with paragraph (A)(1)(a) of rule 3304:1-21-04 of the Administrative Code;

(11) Participate in selection committee when considering applicants for a facility for which he/she is assigned;

(12) Seek and advise [the Business Enterprise Program] with respect to potential facility locations and participate in designing and establishing new facilities.

Ohio Admin. Code 3304:1-21-11(D) (2006); (*See also* Specialist Position Description, Pl.'s Dep.

Ex. 4; ECF No. 21).

Plaintiff reported to Defendant Lisa Kemp, one of the two Assistant Managers for the

Business Enterprise program. Kemp held this position beginning in September 2006. Before

being awarded the Assistant Manager position, Kemp, who is legally blind, was a Business

Enterprise Operator from 1993-2006. For approximately two years during Kemp's time as an

Operator, Plaintiff was her Specialist.

An RSC Assistant Manager is required to "administer the business enterprise program in

his/her area." Ohio Admin. Code 3304:1-21-11(F) (2007). As Assistant Manager, Kemp was responsible for the Columbus and Cincinnati areas. She was responsible for the equipment warehoused in the program's industrial warehouse, for organizing and arranging training sessions and meetings, and working on contracts for program needs. Kemp worked with staff to ensure that they followed program and RSC rules and policies, especially rules that govern the Business Enterprise program. Kemp also supervised Specialists and approved weekly itineraries, leave, and payroll.

Defendant Steve Moore held the position of Assistant Deputy Director of the Bureau of Services for the Visually Impaired ("Bureau") beginning in September 2006. The Bureau is overseen by RSC and is "responsible for implementing the provisions of the Randolph-Sheppard Act and its amendments and sections 3304.28 to 3304.35 of the [Ohio] Revised Code." Ohio Admin. Code 3304:1-21-01(B). Prior to that, from 2001 through 2006, Moore was the Assistant Manager of the Business Enterprise Program and was a Specialist for approximately 17 years. As Assistant Deputy Director, Moore oversaw the Business Enterprise Program on a statewide basis. There were 14 Business Enterprise staff: two Assistant Managers, one Administrative Assistant 3, two Administrative Assistant 1, and nine Specialists. Moore directly supervised the Assistant Managers and the Administrative Assistants.

Mike Hanes[1] held the position of Director of the Bureau from April 2006 through November, 2009. Prior to that, from 1996 through 2006, Hanes was the Assistant Director of the Bureau. As Director of the Bureau, Hanes had the overall responsibility for the organization.

---

[1]In his complaint, Plaintiff names Keith Miller as a defendant, alleging that he was the Director of the Bureau at all relevant times. No party, however, provides evidence or argument related to Miller.

4

Ohio Admin. Code 3304:1-21-11(B). Hanes was responsible for the vocational rehabilitation program, independent living for the older blind, and the Business Enterprise program. Hanes also served on the executive-level team dealing with matters that affected the entire agency, monitored budgets, program operations, and human resources matters. Additionally, Hanes made recommendations to the Executive Director on disciplinary matters. In oversight of the Business Enterprise program, Hanes was kept informed of issues regarding Specialists through personal discussions and email with Assistant Deputy Director Moore.

From 2000 through 2009, John Connelly held the position of Executive Director of RSC. As Executive Director, he was responsible for the day-to-day operations of the RSC. *See* Ohio Rev. Code § 3304.15. The Executive Director is the appointing authority for RSC, and makes the final decision on recommendations for discipline and termination of employment.

### 3. Plaintiff's 1996 Union Grievance Related to Seniority Promotions

Plaintiff was a member of a collective bargaining unit throughout his employment with RSC. On May 6, 1996, Plaintiff filed a grievance, arguing that the selection process for a Business Enterprise Coordinator position violated the union agreement by not giving appropriate consideration to seniority. Plaintiff and RSC reached a settlement of this grievance on July 15, 1999, whereby Plaintiff would receive the next available Coordinator position.

Plaintiff added Coordinator duties in 2001 as the result of the union grievance settlement. Plaintiff estimates that he spent 70% of his time on his Specialist duties and 30% on his Coordinator duties. As the Coordinator, Plaintiff was responsible for training, marketing the Business Enterprise program, training new Business Enterprise candidates, continuing education for existing Operators, and preparing for the annual statewide meeting. As a

5

Coordinator/Specialist, Plaintiff oversaw six Operators, in comparison to the typical 10–12 for full-time Specialists.

## B. Plaintiff's Applications for Promotion

### 1. Assistant Deputy Director Position

In June 2006, Plaintiff applied for a vacant Assistant Deputy Director position. The minimum qualifications for the position were an undergraduate degree in business administration, two years experience in management, and two years experience in administration, managerial, or supervisory position; or four years experience in business or public administration and two years in an administrative, managerial, or supervisory position; or equivalent experience.

RSC received 156 applications for the position. Eight candidates, including Plaintiff, were chosen to be interviewed. There were three external candidates and five internal candidates. Executive Director Connelly, Bureau Director Hanes, Human Resources Coordinator Gwen Biglin, Diversity Manager Sandra Montgomery, Lisa Kemp (then an Operator), and Brenda Curtiss from the State Independent Living Program comprised the interview committee. Each candidate was asked eight questions. Candidates were ranked independently and then the panel members discussed their rankings of each candidate. Plaintiff was ranked last of those interviewed, scoring 116.25 points. He was 50 points below the next candidate, and over 150 points away from the leading contenders for the position.

Based on the interview scores, one internal candidate and one external candidate were under final consideration. Director Hanes and Executive Director Connelly discussed each candidate and selected Steve Moore for the Assistant Deputy Director position, then one of two Assistant Managers for the Business Enterprise program. Moore began serving as the Assistant

Deputy Director on September 3, 2006.

### 2. Assistant Manager Position

Also in June 2006, Plaintiff applied for one of the two Assistant Manager positions.  As with the Assistant Director position, the posting listed job duties and minimal qualifications, which could be satisfied with a combination of education and experience in training or in supervisory, administrative and/or managerial positions; or the qualifications could be satisfied with training and experience in business administration, management, public administration; or supervisory or staff experience.

RSC received 87 applicants for the position, and 10 candidates were interviewed: nine internal candidates and one external candidate.  Bureau Director Hanes, Bureau Southwest Area Manager Paula Shew, Ohio Vendors Representative Committee Representative Tom Deren and Recruiter Barbara Keifer were on the interview panel.  Candidates were asked 10 questions and were ranked independently, then the panel members discussed their rankings for each candidate. Plaintiff ranked eighth out of the 10 candidates interviewed with a 173.5.  Edward Winkfield was ranked first with a score of 339 and Defendant Kemp ranked second with a score of 337.

During the selection process, Steve Moore accepted the Assistant Deputy Director position, creating an additional Assistant Manager vacancy.  Winkfield and Kemp, the two highest scores on the interview process, were selected for the two vacancies.  Both started their new positions in September 2006.

### C. Plaintiff's Termination

#### 1. Operator Patricia Pullien-Kirtley

Patricia Pullien-Kirtley was an Operator for RSC and ran Store 259, which is located at

RSC's headquarters.  The RSC facility houses approximately 600 employees.  Kirtley operated a cafeteria with a vending area attached.  Plaintiff was Kirtley's Specialist for the last three years of her work as an Operator.  During that three years, Kirtley received numerous complaints about the cleanliness, service, and food quality at the facility.

In September 2004, Plaintiff scored Kirtley high in his evaluation of her work at Store 259.  As part of the evaluation, Plaintiff's supervisors complete a section in which they indicate whether they agree or disagree with the evaluation.  Plaintiff's supervisors, Kyle Feusner and Steve Moore disputed the appraisal, noting, *inter alia*, the "numerous reported complaints about facility cleanliness" and about "service and food quality."  (Pl.'s Dep. Ex. 20; ECF No. 21-1 at 163.)  The supervisors directed Plaintiff to work with Kirtley to correct the deficiencies.

From May 2006 until Kirtley's licence to operate Store 259 was suspended,  RSC received numerous complaints about her operation of the store, including: rude behavior of staff, inappropriate dress of staff, loud music, unattended children, toenail painting on food service counters, expired and spoiled products, poor food storage, cook wearing same apron in the restroom and behind the grill, staff using same gloves to pick up floor and prepare food, roaches, early closings and late openings, high and fluctuating prices, broken and/or empty vending machines, poor food variety, and unhealthy menu.  Plaintiff received some of these complaints about Operator Kirtley directly, and some were brought to his attention by his superiors, Kemp, Moore, or Hanes.

In May 2006, the RSC employees organized a boycott and posted the following document around the building:

TOP 10 REASONS TO BOYCOTT THE CAFETERIA

10. Rude behavior from the workers.

9. Unable to negotiate the area with all the unnecessary children and friends of the workers milling around.

8. Broken microwaves never being fixed.

7. Toe nail painting by workers on the counters where our food is set.

6. They never open on time in the morning and apparently they can close whenever they feel like it.

5. Tomatoes cost about 50 cents per pound at the grocery store but just a slice at the cafeteria costs 25 cents due to some hurricanes that caused a shortage 2 years ago.

4. Cafeteria workers use gloves but then pick things up from the floor and continue using the same gloves.

3. You have to buy silverware if the cafeteria workers doesn't believe that you are using it for the food you purchased.

2. Cans of pop are now $1.

1. RSC pays for water and electricity to make ice and hot water and then we must purchase it again because we cannot use our own container

(Vaughn Aff., Ex. I; ECF No. 24-2 at 216.)  Several employees alerted Plaintiff of this boycott and also sent this document to him.

In October 2006, Moore again directed Plaintiff to work with Kirtley to improve her performance.  In a letter dated October 7, 2006, Plaintiff advised Kirtley that she was operating below an acceptable level for gross profit, net profit, wages, and miscellaneous expenses.  (Pl.'s Dep., Ex. 22; ECF No. 21).  The letter also mentioned customer complaints regarding inconsistent prices, rudeness, limited product selection, unfilled vending machines, and the

9

cafeteria not opening at the scheduled time.  Plaintiff required Kirtley to review a seven series training tape and forwarded the complaints to her.

Kemp sent Kirtley a letter a few weeks later, on October 24, 2006, advising her of the need for a corrective action plan.  (Pl.'s Dep., Ex. 23).  Kemp's letter reiterated the customer complaint issues, and then provided more detailed analysis of the financial situation at Facility 259.  Kemp estimated a sales decrease of 16.9%, a gross profit decrease of 25.2%, and a net profit decrease of 44.4%.  Kemp states in the letter that these numbers "indicate a complete lack of control over business matters" and that the facility is in "danger of being lost."  *Id.*  Kemp specifically advised Kirtley that, "Your mismanagement of Facility 259 has risen to a level of zero tolerance making my learning of a repeat of any one of the above described situations cause for me to recommend suspension of your Bureau-Operator Agreement to the Bureau Director, Michael Hanes."  *Id.*

On October 25, 2006, Plaintiff presented to Kirtley his yearly appraisal of her in which she was rated on the following scale: Excellent, Acceptable, Unacceptable, Not Applicable, Plan of Corrective Action.  (Vaughn Aff. Ex. L; ECF No. 24-2 at 170–73.)  Plaintiff rated Kirtley with nearly all acceptable ratings and in the "sanitation and safety"section he rated her excellent in every evaluation.  In the supervisor section, Kemp disagreed with the evaluation on numerous grounds.

Plaintiff reviewed Kirtley's corrective action plan which she submitted on November 21, 2006.  On December 3, 2006, Kemp disapproved the plan.  Kemp listed the specific deficiencies and suggested what information could be provided to make the plan acceptable.

On December 6, 2007, Kirtley telephoned Plaintiff that she would be late opening the

10

cafeteria, which is scheduled to open at 7:00 a.m. When Kemp arrived at work after 7:30 a.m., the cafeteria was not opened. Kemp went to Assistant Deputy Director Moore's office and discussed the issue with Moore and Director Hanes. After discussing the issues related to Kirtley's lengthy and serious performance issues, the three decided that the appropriate action was a suspension of Kirtley's license.

The process for removal of Operators from the Business Enterprise Program is governed by the Ohio Administrative Code. Ohio Admin. Code 3304:1-21-10 (operator corrective action). Defendants followed that procedure to remove Kirtley from her position. Plaintiff, Kemp, Moore, Hanes and Winkfield, the other Assistant Manager, met to plan the suspension, which was for failure to uphold the grantor agreement and to adhere to the policies and procedures of the facility. Kemp and Plaintiff delivered the letter to Kirtley.

After informing Kirtley of the revocation of her license, Kirtley, Kemp, Plaintiff and Diane Bagdassarian, another Specialist, performed a closing inventory, which took the remainder of the day. Ohio Admin. Code 3304:1-21-07 (closing a facility). Plaintiff also performed a closing facility inspection and discovered that Kirtley had not paid her workers' compensation insurance, had not paid her service charges, owed money to RSC, and had a negative balance.

The next day, Kemp arrived at Store 259 with Jeff Tolle and his wife Michelle, who were the temporary operators. Shortly thereafter the Tolles sent a memorandum to Kemp, detailing the conditions of the facility at the time they took over. (Ashanin[2] Aff., Ex. I, pp. 203-204). The memorandum listed numerous sanitary concerns, including dirty and heavily greased floors in the

_____

[2]Janine Ashanin is the Director of Human Resources at RSC and, in the scope and course of her job duties is the custodian of records. (Ashanin Aff. ¶ 1.)

food preparation area, lack of any cleaning soaps or detergents, refrigeration units without thermometers and improper temperature, food without date labels (both in the refrigerator and in the serving area), unlabeled containers of food with mold on them, outdated products (including milk that was five months old), and dirt, grease, and dust on almost every surface. The memorandum also outlined issues with the vending machines, some of which did not function, others malfunctioned, and some simply empty.

As required by the Ohio Administrative Code, Hanes presented information relating to Kirtley's removal to the Ohio Vendors Representative Committee ("OVRC"). Ohio Admin. Code 3304:1-21-10. The OVRC is a peer-elected body. Operators elect another Operator to represent them at the state level for state policy and program administration decisions. OVRC is not involved with a removal until after the fact.

The OVRC upheld Kirtley's removal, but in doing so, expressed serious concerns with Plaintiff's responsibility in the matter. (Pl.'s Dep., Ex. 29.) The OVRC noted that Plaintiff repeatedly failed to document or counsel Kirtley on performance issues, and that the advice he did give her was faulty, either based on inability to provide accurate information or unwillingness to adequately assist her. OVRC was especially concerned with the lack of documentation from Plaintiff, stating:

> This packet included survey results and various customer complaints, but had absolutely nothing from Mr. Simmons documenting her inability to open on time, the reason for the BOA suspension. There was also absolutely no documentation from Mr. Simmons regarding any other managerial concerns, including fiscal responsibility, safety and sanitation, or customer service issues, which were the overall basis for the necessity of the corrective action plan. There were no documented concerns in quarterly inspections or vendor appraisals shown to this committee. There was not (sic) documented record of Ms. Pullien-Kirtley's not opening her facility, no dates, no specifics at all, and thus no documentation. This

12

lack of any record is of grave concern to this committee, and demonstrates a considerable failure on the part of Mr. Simmons to do his job.

*Id.*

The OVRC concluded that

[it] unanimously feels, that though Ms. Pullian-Kirtley had serious concerns of her own, that Mr. Simmons' lack of responsibility is equally to blame for the problems with this facility, and that he should be held accountable for his inaction. We are therefore requesting that you, the Bureau staff, will agree that serious problems are present in Mr. Simmons' job performance concerning this facility, and thus hold him accountable. The committee feels very strongly that it is very unfair for only one party to hold the entire blame and thus consequent, when the other contributed to the problem through his own inaction. In other words, Ms. Pullian-Kirtley is now unemployed because of her actions, but Mr. Simmons is left with absolutely no consequence for his part in this, and we believe this is unjust, and are hopeful that you will rectify the situation.

The OVRC would appreciate a response from any or all of you regarding our concerns with Mr. Simmons' job performance, and would like to know what steps you intend to take about this serious problem.

*Id.*

## 2. RSC Investigates Plaintiff Resulting in Recommendation for Removal

RSC initiated an investigation of Plaintiff's work. During this investigation Plaintiff was not permitted to contact Operators, which is RSC's standard practice when conducting investigations. During the investigation, Plaintiff was temporarily assigned other work, which Plaintiff claims was outside of the scope of his normal duties.

Alison Vaughn conducted the investigation. Vaughn is an African American female who was a Labor Relations Officer 3 and was outside of Plaintiff's supervisory chain. (Vaughn Aff. ¶ 1; ECF No. 24-2 at 1.) Vaughn gathered information relating to Store 259, Kirtley's license suspension and closing inventory, and Plaintiff's other facilities. Vaughn also reviewed the contents of Plaintiff's work computer, as is standard practice during an administrative

investigation, and conducted interviews with Plaintiff, Hanes, Moore, Kemp, Bagdassarian, Tolle, and Rick Kemp. Additionally she gathered written statements from Rick Kemp and Annette Lutz. Finally, Vaughn gathered and reviewed email and letter complaints, applicable policies and other relevant documents. Her report and exhibits comprised early 500 pages.

While investigating Plaintiff's work performance, Vaughn found other issues relating to "misuse of the State computer, specifically using the State computer for personal, for-profit business." *Id.* at 7. Specifically, Vaughn reports:

> Mr. Simmons was asked about the use of the State computer for personal for profit business. He initially denied using it for this purpose, also denying that he had a financial interest in the businesses he was questioned on, until he was pressed further and shown specific evidence contradicting his denial, whereupon, he changed his answer to he only used it during breaks or lunch.

*Id.* at 9. Plaintiff was then the owner of Eagle Business Enterprise, a cleaning service that is incorporated and licensed in Ohio.

Vaughn was also concerned about Plaintiff's attempt to utilize his union representative to, as she found, interfere with the investigation, stating:

> On or about January 16, 2006, Union Representative, Keith Goudy, contacted Management regarding concerns based upon an email Mr. Simmons had sent that morning. (Exhibit DD, attachment). This email indicated in part, Ms. Kemp's husband Rick Kemp, "took Eugene Veasey Operator at facility 524 who I am (sic) his Specialist, to Wasserstrom (equipment Store) to purchased (sid) items for his cafeteria. We normally have items delivered to the operator's facility as we have to have a purchased (sic) order number. Eugene Veasey said that Rick was asking questions abut (sic) me and his facility. Eugene said he just talked about how I have helped him in his facility and that he has increased sales. Also I received a call from Karen "Mozell" Raines (Operator of facility 384 cafeteria): she also was contacted by Lisa to say something negative about me." This email suggests misconduct by Mr. Kemp, who is contracted with ORSC to provide reading and driving services to Ms. Kemp; Mr. Kemp, as part of his contract has signed a confidentiality agreement. Therefore, findings that he may have used his position inappropriately could result in termination of that contract. This email also suggests that Ms. Kemp was actively

seeking negative information about Mr. Simmons, which may also be inappropriate. However, upon investigation, including speaking to all operators, and Mr. Simmons again, these assertions were unfounded and as they pertain to the statements attributed to Mr. Veasey and Ms. Raines, were false. (Exhibits W, X, Y, FF)

*Id.* at 9 (parentheticals in original). Vaughn added to her Report the interviews of Rick Kemp, Eugene Veasey, and Karen Mozelle Raines.

Vaughn concluded that her investigation substantiated Plaintiff's violation of the following:

*       Violation of the Agency's Partnership for Success Policy, HR 2002.36 . . . (Exhibit II)

*       Violation of ADM 2004.11, which provides online services for operating a business for personal gain . . . . (Exhibits LL and MM)

*       Violation of ADM 2006.05 Information Technology Services Security Agreement, which prohibits operating a business, directly or indirectly, for personal gain is strictly prohibited. (Exhibit OO)

*       Violation of HR 2007.01 Performance Management Policy, which became effective October 16, 2006, specifically: (Exhibit KK)

- 4.2 – Making false, abusive, inflammatory or obscene statements toward or concerning a supervisor - based on false and misleading statements attributed to operators by Mr. Simons.

- 4.3 – Failure to fully cooperate, interfering with and/or providing false, incomplete or misleading information in an investigation or inquiry - based on false statements provided in investigatory interviews including statements about the December 2006, closing inventory for facility 259, the false statements attributed to Operator Tolle, Operator Raines, and Operator Veasey, providing false statements about the use of his RSC computer, and his private for profit ventures.

- 7.1 – Failure to carry out assigned job duties based on his failure to provide adequate appropriate support to Operator Pullien-Kirtley, failure to respond timely to Operator Hamilton.

> - 7.5 – Failure to follow work rules, administrative rules or regulations, written policies or procedures, the Ohio Administrative Code, and/or the Ohio Revised Code based on failure to follow OAC 3304:1-21-11 and OAC 3304:1-21-07.

*Id.* at 10.

Vaughn noted in her conclusion, *inter alia*, that Plaintiff had enough experience that he should have been able to perform his job, but that he failed to do so competently in the closing inventory of Kirtley's cafeteria. She also found "other anomalies" in prior inventories conducted by Plaintiff. She specifically noted that

> Mr. Simmons neglect of duty may have impaired the ability of a consumer to successfully maintain gainful employment. If Mr. Simmons had provided the requisite support as delineated in his role of BE specialist, i.e., more than a 7 series training tape and forwarding of complaints, perhaps Operator Pullien-Kirtley would have been successful as an operator or at least given the fullest opportunity to succeed. Providing "management direction and consultation services to food service facility operators" encompasses more.

> Mr. Simmons was dishonest during the investigation. His dishonesty caused undue disruption to the investigation, compromised the reputation of the BE program, imputed the reputation of a contractor and subjected his supervisor to potential disciplinary action.

*Id.* at 11.

Vaughn recommended:

> Termination pursuant to both the pervious HR 2002.62 Procedural Steps and Process for Formal Discipline (Exhibit JJ) and HR 2007.01 Performance Management Policy (Exhibit KK) of Mr. Simmons' employment is appropriate given the pervasiveness of the misconduct . . . .

*Id.* at 11.

### 3. Plaintiff's Pre-Disciplinary Hearing

Plaintiff participated in a Pre-Disciplinary Hearing on March 13, 2007, held before Labor

Relations Administrator Bruce A. Mrofka.  (Ashanin Aff., Ex. A; ECF. No. 24-1 at 4–27.)

Plaintiff was accompanied by a Union Steward and was given the opportunity to present his

version of the events.  The Administrator issued a Report and Recommendation in which he set

forth the evidence submitted, made findings of fact, and determined that there was just cause for

terminating Plaintiff.

These findings were conveyed to Executive Director Connelly who considered the Report

and Recommendation from the due process proceedings, as well as exhibits and information

from RSC and from Plaintiff.  Connelly found just cause for Plaintiff to be removed and

informed Plaintiff of this decision in a letter dated April 4, 2007.

## D.  Plaintiff Files Union Grievance and Arbitrator Upholds Termination

Plaintiff filed a union grievance regarding his removal.  The grievance ultimately went to

arbitration before Arbitrator John J. Murphy.  On August 23, 2008, the arbitrator upheld the

termination.  (Ashanin Aff., Ex. D; ECF No. 24-1 at 28–80.)  Specifically, the arbitrator found

that Plaintiff had made false statements about Lisa Kemp, and by doing so, had obstructed RSC's

investigation.  The arbitrator also found that Plaintiff failed to carry out his specialist duties in his

lack of assistance to Kirtley, and had used his work computer for personal gain by housing

materials related to his position as an instructor at Columbus State Community College, such as

exams and student grades, and related to his personal for-profit business.

Professor Murphy found particularly disturbing the testimony of Operator Raines, stating:

> Karen Raines' testimony is credible, crucial, and compelling.  It shows [Plaintiff]
> deviously enveloping his innocent, blind clients into an investigation of his own
> conduct.  Raines, as well as two Operators mentioned in his email, were persons
> being monitored by him and whose performance was being annually evaluated by
> him.  They were under a deep level of dependency upon [Plaintiff].

17

*Id.* at 40. The arbitrator found that, "measured by his own conduct," Plaintiff "exhibits little

concern for the blind." *Id.* at 57–58. He continued:

> First, his ease in enveloping his blind clients into the investigation of his own
> conduct as a Specialist manifests a callousness to the vulnerability of his clients. He
> cast these blind clients into an agonizingly difficult choice–support their mentor or
> face retribution. The testimony of Operator Rainses painfully demonstrates this
> point.

*Id.* at 58. The arbitrator concluded:

> [Plaintiff] cannot be trusted to return to an organization devoted to the service of the
> blind. Despite his long service to the Commission, he forfeited any claim to return
> to the Business Enterprise Program – a program devoted to independent,
> entrepreneurial life for blind persons.

*Id.* at 59.

### E. Ohio State Highway Patrol Investigation

On October 23, 2007, Executive Director Connelly reported the findings related to the

improper inventory in which Plaintiff was involved to the governor's office and the Ohio State

Highway Patrol. As Executive Director of RSC, Connelly was required to submit a report if

there were any concerns about theft in office. The Ohio State Highway Patrol investigated

Plaintiff and determined that Plaintiff did not engage in theft in office and, instead, the missing

inventory was likely improperly noted as a result of a faulty computer system.

### F. Plaintiff's Administrative Charges

On April 27, 2007, 20 days after his termination, Plaintiff filed his first charge with the

Ohio Civil Rights Commission ("OCRC") alleging race discrimination and retaliation. Plaintiff

filed a second charge on May 23, 2007, and a third charge on April 29, 2008. Plaintiff was

issued an administrative decision from the OCRC permitting him to obtain from the United

18

States Equal Employment Opportunity Commission Letters of Dismissal and Notice of Rights to Sue. (ECF No. 1-1.)

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. *See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts"). Consequently, the central issue is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

19

that one party must prevail as a matter of law.'"  *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234-35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251-52).

### III.

Plaintiff brings his race discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq*. ("Title VII") and 42 U.S.C. § 1981 ("Section 1981").

### A. Discrimination

"'Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship.'"  *Talwar v. Catholic Healthcare Partners*, 258 F. App'x 800, 804 (6th Cir. 2007) (quoting *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006)).  Title VII prohibits discrimination in employment.  42 U.S.C. §2000e *et seq*.

Section 1981 claims are analyzed under the same standards as claims under Title VII.  *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 n.5 (6th Cir. 2000) (noting that the elements of *prima facie* case and burdens of proof are the same for Title VII and § 1981).  To establish a discrimination claim under Title VII, "a plaintiff must either present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment."  *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir. 2003) (citation omitted).

"Direct evidence, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  *Grizzell v. City of Columbus Div. of Police*,

20

461 F.3d 711, 719 (6th Cir. 2006) (citing *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)). "Once plaintiffs produce direct evidence of discrimination, the burden shifts to the employer to show that it would have taken the employment action even in the absence of discrimination." *Id.* If a plaintiff fails to present direct evidence of discrimination, the burden shifting framework first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and refined by *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981), applies. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000). Plaintiff contends that he has presented both direct and circumstantial evidence of discrimination.

### 1. Direct Evidence of Race Discrimination

Plaintiff offers as direct evidence, "Affidavits from his co-workers and peers most of which have far more expertise and experience in the Business Enterprise Program." (Pl.'s Mem. in Opp. at 14.) While it is true that Plaintiff has submitted affidavits as part of his 148 pages of exhibits, he fails to direct the Court's attention to *any* examples of direct evidence, and his argument makes no reference to direct evidence of discrimination. In ruling on a motion for summary judgment "[a] district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *Glover v. Speedway Super Am. LLC*, 284 F. Supp.2d 858, 862 (S.D. Ohio 2003) (citing *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989)). Instead, a "court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties." *Id.*; Fed.

21

R. Civ. P. 56(c).

Defendants, however, have pointed out four possible examples of direct evidence found in Plaintiff's and his coworkers' affidavits. In the affidavit of Dianne Bagdassarian, she avers that Lisa Kemp made the statement, "I won't work with him . . . he has to go." (Bagdassarian Aff., Ex. H, ¶ 15.) Plaintiff also alleges that Kemp stated to him, "I believe I can work with someone like you," which meant that she "was told it would be hard to work with [him]." (Pl.'s Aff., Ex. HH.) These comments do not reference race, and drawing an inference that they are race-related destroys the argument that the comments are direct evidence. *See Johnson*, 319 F.3d at 865.

The only remaining allegation is that Doug Brusso alleges Kemp's husband once stated to Operator Jack Davis that BE meant "Black Entitlement." (Brusso Aff., Ex. L, ¶ 8.)   As Defendants correctly point out, in addition to this alleged statement constituting inadmissible hearsay, a single, isolated comment by a Defendant's husband is not relevant to the issue of whether any of the decision-makers acted with discriminatory intent toward Plaintiff. *See Johnson v. Kroger Co.*, 160 F. Supp.2d 846, 853 (S.D. Ohio 2001), rev'd on other grounds, 319 F.3d 858 (6th Cir. 2003) ("Direct evidence is not demonstrated through stray remarks, remarks by non-decision makers, comments that are vague, ambiguous, or isolated, and comments that are not proximate in time to the act of termination.") (citing *Martin v. U.S. Playing Card Co.*, 172 F.3d 48, 1998 WL 869970, *4 (6th Cir.1998); *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1330 (6th Cir.1994)).

Accordingly, the Court finds that even when viewing the evidence in the light most favorable to Plaintiff, and drawing all justifiable inferences in his favor, he has failed to offer any

direct evidence of race discrimination.

## 2. Circumstantial Evidence of Race Discrimination

"[T]o establish a *prima facie* case of [discriminatory termination] by the defendant, 'the plaintiff must show (1) that he is a member of a protected group, (2) that he was subject to an adverse employment decision, (3) that he was qualified for the position, and (4) that he was replaced by a person outside of the protected class. . . . the fourth element may also be satisfied by showing that similarly situated non-protected employees were treated more favorably.'" *Clayton v. Meijer, Inc.*, 281 F.3d 605, 610 (6th Cir. 2002) (alteration in original) (quoting *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995)). The fourth element is modified in a failure to promote case, in which "it is incumbent upon the plaintiff to establish that []he and the non-protected person who ultimately was hired for the desired position had similar qualifications." *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 242 (6th Cir. 2005) (citations omitted).

Once the *prima facie* case is made, a defendant may offer any legitimate, nondiscriminatory reason for the employment action, which the plaintiff may rebut by evidence of pretext; however, the burden of proof always remains with the plaintiff. *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996) (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993)). In the instant action, Defendants indicate that they did not promote Plaintiff because he was less qualified than the individuals who won the promotions and they terminated him for poor performance and improper behavior during an investigation of his performance. These are legitimate, nondiscriminatory reasons. "It is important to note that the defendant need not prove a nondiscriminatory reason for not promoting [or terminating the plaintiff], but need merely

23

articulate a valid rationale. *Id.* (citing Hicks, 509 U.S. at 514).

Because Defendants have articulated a valid rationale, the burden shifts to Plaintiff to show that Defendants' proffered reason for terminating him was a pretext for unlawful discrimination. The Sixth Circuit has indicated that a plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009) (citing *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 460 (6th Cir. 2004); *see also Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), overruled in part by *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000). "To carry h[is] burden in opposing summary judgment, [the plaintiff] must produce sufficient evidence from which a jury could reasonably reject [the defendant's] explanation of why it fired h[im]." *Id.* (citing *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 526) (6th Cir. 2008)).

The Court finds that it is unnecessary to determine whether Plaintiff has established his *prima facie* case of discrimination because, even if he has, Defendants are still entitled to summary judgment. This is so because Defendants have offered legitimate, nondiscriminatory reasons for not choosing Plaintiff for a promotion and for terminating Plaintiff, which cannot on the facts before this Court be shown to be pretext for discrimination. In reviewing Plaintiff's evidence he submits as support for his pretext argument, he does not utilize the formal tripartite formula set forth above. The Sixth Circuit, however, has noted that with regard to "this three-part test," "it is important to avoid formalism in its application, lest one lose the forest for the trees." *Chen*, 580 F.3d at 402, n. 4. The court explained:

24

Pretext is a commonsense inquiry: did the employer fire the employee for the stated reason or not? This requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is. One can distill the inquiry into a number of component parts, and it can be useful to do so. But that should not cause one to lose sight of the fact that at bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) ("[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason."); *Forrester*, 453 F.3d at 417 ("If [the proffered reason] is not the true ground, the employer may still be innocent of discrimination; he may for example have lied to conceal a reason that was discreditable but not discriminatory.) (citations omitted).

At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation. If so, her prima facie case is sufficient to support an inference of discrimination at trial. *Hicks*, 509 U.S. at 511. But summary judgment is proper if, based on the evidence presented, a jury could not reasonably doubt the employer's explanation. *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148, (2000) ("[A]n employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.").

*Id.* (parallel citations omitted); *see also Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) ("But we have never regarded those categories as anything more than a convenient way of marshaling evidence and focusing it on the ultimate inquiry: 'did the employer fire the employee for the stated reason or not?' As we have stated, 'at bottom the question is always whether the employer made up its stated reason to conceal intentional [discrimination].'").

### a. Termination

Defendants contend that they utilized their business judgment in terminating Plaintiff based on Vaughn's investigation of him. Plaintiff takes issue Vaughn's investigation, submitting his affidavit that disagrees with all of her conclusions. This evidence is insufficient to raise any

genuine issue of material fact as to whether defendants terminated him based in any way on his race. Plaintiff "must allege more than a dispute over the facts upon which his discharge was based. He must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001) (citations omitted). The *Braithwaite* court explained:

> In order to determine whether the defendant had an "honest belief" in the proffered basis for the adverse employment action, this Court looks to whether the employer can establish its "reasonable reliance" on the particularized facts that were before it at the time the decision was made. *See Smith*, 155 F.3d at 807. In *Smith v. Chrysler*, this Court provided some guidance in determining whether reasonable reliance was present. We stated:
>
> > In deciding whether an employer reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.
>
> *Id.*
>
> If there is no material dispute that the employer made a "reasonably informed and considered decision" that demonstrates an "honest belief" in the proffered reason for the adverse employment action, the case should be dismissed since no reasonable juror could find that the employer's adverse employment action was pretextual.

*Id.* at 494.

In the instant action, as set forth in detail *supra*, Alison Vaughn, on behalf of RSC, conducted an independent investigation into the allegations against Plaintiff, and thoroughly explored his performance as well as several other issues. Vaughn was not in Plaintiff's supervisory chain and he did not regularly work with her. Indeed, there is no allegation that the

investigation, by an African American female, was racially discriminatory toward Plaintiff.

"None of Plaintiff's claims regarding pretext undermine [RSC's] assertion that it had a well-founded belief, based on the particularized facts in the" investigation performed by Vaughn. *Romans v. Michigan Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012) (employer's reliance on Summary of Investigation constituted reasonable reliance on the particularized facts that were before it at the time the adverse employment decision was made). Vaughn independently determined that Plaintiff's behavior warranted termination. Her determination was based not only on an analysis of his job performance, but also on three other issues which arose after he was reported by his supervisors: his interference with the investigation, his making of false statements, and his inappropriate personal use of his business computer. The Investigation Report includes particularized facts in the form of nearly 500 documents, including 12 witness interviews or statements, over 25 email complaints, applicable policies, and other documentation of Plaintiff's performance issues. "Although Plaintiff contests the validity of" Vaughn's findings, "this dispute is immaterial because it does not undermine [RSC]'s well-founded belief in the particularized facts that were set forth in the . . . Investigation at the time Plaintiff was fired." *Id.* (citation omitted). "[RSC] need not prove all of the statements in the [] Investigation were correct, but rather that it made its decision to terminate Plaintiff 'based on an honestly held belief in a nondiscriminatory reason supported by particularized facts after a reasonably thorough investigation.'" *Id.* Here, RSC has done just that.

The Court finds that Plaintiff has produced no evidence from which a jury could reasonably doubt Defendants' explanation of his termination. Therefore, summary judgment in Defendants' favor on this claim is proper.

27

### b. Promotion

As evidence of pretext related to promotion to the Assistant Manager position, Plaintiff

submits that his "qualifications were significantly better than Lisa Kemp's qualifications." (Pl.'s

Mem. in Opp. at 16.)  In this circuit "evidence of comparative qualifications 'may be probative'

of pretext" only when a plaintiff presents other evidence of discrimination. *Bender v. Hecht's*

*Dep't Stores*, 455 F.3d 612, 626 (6th Cir. 2006) ("Of course, acknowledging that evidence of

comparative qualifications 'may be probative' of pretext is a far cry from holding that such

evidence is itself sufficient in all cases to raise a genuine issue of fact of discriminatory

motive.").  The *Bender* court explained:

> Whether qualifications evidence will be sufficient to raise a question of fact as to
> pretext will depend on whether a plaintiff presents other evidence of discrimination.
> In the case in which a plaintiff does provide other probative evidence of
> discrimination, that evidence, taken together with evidence that the plaintiff was as
> qualified as or better qualified than the successful applicant, might well result in the
> plaintiff's claim surviving summary judgment. *See, e.g., Jenkins*, 106 Fed. Appx. at
> 995 (reversing lower court's grant of summary judgment; in addition to evidence of
> superior qualifications, the plaintiff provided evidence of "irregularities in the
> application and selection process," "inconsistencies in the reasons given ... for not
> hiring her," and "the lack of African-American women in supervisory positions" at
> the company).
>
> On the other hand, in the case in which there is little or no other probative evidence
> of discrimination, to survive summary judgment the rejected applicant's
> qualifications must be so significantly better than the successful applicant's
> qualifications that no reasonable employer would have chosen the latter applicant
> over the former.  In negative terms, evidence that a rejected applicant was as
> qualified or marginally more qualified than the successful candidate is insufficient,
> in and of itself, to raise a genuine issue of fact that the employer's proffered
> legitimate, non-discriminatory rationale was pretextual.  This standard accords with
> several of our sister courts' standards . . . and is consistent with our own precedents,
> *see, e.g., Browning v. Dep't of the Army*, 436 F.3d 692, 698 (6th Cir. 2006)
> (explaining that "what matters" is the employer's perception of the applicant's
> qualifications, and noting that this court affords "great flexibility to employers when
> selecting management personnel") (citations omitted); *Hartsel*, 87 F.3d at 801;

> *Wrenn*, 808 F.2d at 502 ("So long as its reasons are not discriminatory, an employer
> is free to choose among qualified candidates.").

*Id.* at 626–27 (selected internal citations omitted).

In this case, the Court finds no probative evidence of discrimination. Therefore, Plaintiff's qualifications must be so significantly better than Kemp's that no reasonable employer would have chosen her over Plaintiff. Both Plaintiff and Kemp met the minimum qualifications for the position. Beyond that, both had lengthy service with RSC and college degrees. Plaintiff had been employed by RSC for approximately 26 years, with 17 years as a Specialist, and Kemp had been a Business Enterprise Operator for 13 years, and had also served on the Ohio Vendors Representative Committee, representing other Operators statewide. Both had degrees in business administration and marketing, Kemp a bachelor's degree and Plaintiff a master's. Kemp was rated substantially higher than Plaintiff on the interview evaluations by decision-makers. Plaintiff was ranked near the bottom of those chosen for interviews, with several applicants between him and the chosen candidate.

The Court notes that an employer may rely upon subjective evaluation factors when making hiring decisions, and it is not the province of the Court to question the use of such factors. *See Browning v. Dept. of the Army*, 436 F.3d 692, 698 (6th Cir. 2006) ("Questioning the Army's hiring criteria is not within the province of this court, even if the Army's hiring process was entirely subjective. Browning has never asserted that the Army used subjective criteria to mask a discriminatory motive, and without any allegations of a discriminatory intent, Browning cannot meet his burden of persuasion on this issue."). But the Sixth Circuit has also cautioned that such "subjective evaluation processes intended to recognize merit provide ready mechanisms

29

for discrimination." *Grano v. Dep't. of Dev.*, 699 F.2d 836, 837 (6th Cir. 1983).  The "ultimate

issue in each case is whether the subjective criteria were used to disguise discriminatory action."

In the instant action, Plaintiff makes no allegation that the subjective criteria were utilized to

disguise racially discriminatory action, nor any evidence to support such an allegation.

Even when viewing this evidence in the light most favorable to Plaintiff, his

qualifications are not so significantly better than Kemp's that no reasonable employer would

have chosen her over Plaintiff.

As to the evidence of pretext related to the position for Assistant Deputy Director,

Plaintiff argues that "[t]he selection committee members were biased by the opinions and

comments made by Lisa Kemp [who was] on the selection committee."  (Pl.'s Mem. in Opp. at

16.)  The Court recognizes that "[w]hen an adverse hiring decision is made by a supervisor who

lacks impermissible bias, but that supervisor was influenced by another individual who was

motivated by such bias, [the Sixth Circuit] has held that the employer may be held liable under a

'rubber-stamp' or 'cat's paw' theory of liability." *Arendale v. City of Memphis*, 519 F.3d 587, 604

n. 13 (6th Cir. 2008) (citations omitted).  Here, however, there is no allegation, nor any evidence

to support one, that Kemp held a racial prejudice that was the proximate cause of the promotion

decision.  Instead, Plaintiff relies upon an affidavit of Karen Whalen, a retired RSC employee:

> Whallen (sic) expressed severe concern over the fact that in both positions that
> Plaintiff applied for Lisa Kemp was involved in the selection process.  Lisa set on the
> interview committee for the Program Manager job and then once Steve Moore was
> selected she interviewed with Steve Moore for the Area Manager position.  Whallen
> (sic) felt this gave Kemp an unfair advantage in the selection process for Area
> Manager.

(Pl.'s Mem. in Opp. at 15–16.)  Plaintiff also submits other affidavits from current or previous

coworkers that aver that Plaintiff was more qualified for the positions he failed to obtain than the successful applicants and that racial discrimination was the likely reason for RSC's choice not to promote him. The coworkers allege discrimination, but include no actual specifics as to a decisionmaker or anyone who influenced a decisionmaker. There are simply no facts to support the conclusions of racial bias.

This evidence falls far short of raising any issue of material fact as to whether Defendants' denial of the sought-after promotion was racially discriminatory. Even if it were true that Kemp was given an unfair advantage, which Defendants deny, no inference of racial discrimination can be drawn from that fact. Indeed, "[t]he law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with. Rather, employers may not hire, fire, or promote for impermissible, discriminatory reasons." *Hartsel v. Keys*, 87 F.3d 795, 801 (6th Cir. 1996). *See also Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir.1987) ("employers are generally 'free to choose among qualified candidates'").

The only evidence before the Court related to racial discrimination are the affidavits of Plaintiff's former or current coworkers who make conclusory statements without any factual support that Plaintiff was more qualified than Kemp and that he was not awarded the promotion based on racial discrimination. The *Harstel* court, in reviewing similar affidavits from coworkers, stated that the "affidavits reveal perhaps a reasonable difference in opinion, but their bald assertions and conclusory statements fail to provide any factual support for Hartsel's claim of sexist, ageist, or politically retaliatory animus." *Id.* The same is true here. Therefore, even when viewing the evidence in his favor, Plaintiff has failed to set forth any genuine issue for trial.

31

**B. Retaliation**

When considering a retaliation claim based on circumstantial evidence, it is "evaluated using the burden-shifting analysis described by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801-05 (1973)." *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 434 (6th Cir. 2009) (parallel citation omitted).  The burden first falls on the plaintiff "who must establish a *prima facie* case of retaliation by showing that: '(1) he . . . engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action.'" *Id.* (quoting *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008)).  Once the plaintiff has made out a *prima facie* case, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for its actions.  *Id.*  If the defendant meets this burden, the plaintiff "bears the burden of demonstrating that this legitimate reason is pretextual."  *Id.*

Defendants move for summary judgment on this claim, arguing that Plaintiff has failed to make out a *prima facie* case of retaliation, and that even if he had, they have offered legitimate nondiscriminatory reasons for their actions which Plaintiff cannot prove to be pretext for retaliation.  This Court agrees.

Plaintiff engaged in the protected activity of filing charges with the OCRC on April 24, 2007, April 29, 2007 and May 23, 2007, filing a grievance regarding promotions based on seniority in 1996, and he claims too that he filed on March 24, 2007 a complaint with the Ohio Department of Administrative Services Equal Opportunity Division.  There is no dispute that the adverse actions about which Plaintiff complains occurred in August 2006 (failure to promote)

32

and April 4, 2007 (termination).

With regard to the OCRC charges, all were filed after the adverse actions had occurred, and therefore, the third element of Plaintiff's *prima facie* case cannot be met. That is, the adverse employment actions were taken before Plaintiff's filing of the OCRC charges, preventing the charges from being able to motivate the adverse action.

As to the grievance filed in 1996, it cannot be considered a protected activity here, for "[a]lthough filing an official complaint with an employer may constitute statutorily protected activity under Title VII, the complaint must indicate that discrimination occurred because of sex, race, national origin, or some other protected class." *Longs v. Ford Motor Co.*, 647 F. Supp. 2d 919, 932 (W.D. Tenn. 2009) (citing *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir.2006) (citations omitted). Plaintiff's grievance was not based on racial discrimination, but instead was based on RSC's alleged failure to properly consider seniority in promotions. *See Mikols v. Reed City Power Line Supply Co.*, No. 1:07-CV-84, 2008 WL 2696915, at *6 (W.D. Mich. July 1, 2008) (finding no protected activity where employee's general comments about "treating people equitably" did not "inform the employer that gender discrimination as opposed to compensation based on results or seniority was [employee's] concern").

Regarding the complaint Plaintiff claims was filed with the Department of Administrative Services Equal Opportunity Division allegedly 11 days before his termination, Plaintiff has offered no evidence. In his memorandum in opposition he makes the claim, but does not cite to any evidence to support it. The Court reviewed his affidavit, but finds no averment in it related to this alleged filing. Thus, this allegation cannot provide a basis for a claim of retaliation. In any event, Defendants have provided testimony that stands unrebutted that the decision-makers

33

were unaware of Plaintiff's complaints of discrimination until after his termination.

However, even if the Court were to find that Plaintiff satisfied his *prima facie* burden, Defendants would still be entitled to summary judgment on his retaliation claims. For the same reasons the Court articulated *supra*, Defendants have produced legitimate, nondiscriminatory reasons for not promoting Plaintiff and for terminating him, which cannot be shown on the facts before this Court to be pretext for retaliation. Accordingly, no reasonable jury could return a verdict in favor of Plaintiff on his retaliation claims.

## IV.

For the reasons set forth above, the Court **GRANTS** Defendants' Motion for Summary Judgment. (ECF No. 24.) The Clerk is **DIRECTED** to **ENTER JUDGMENT** in accordance with this Opinion and Order.

**IT IS SO ORDERED.**

11-27-2013
_____                          _____
**DATE**                                     **EDMUND A. SARGUS, JR.**
                                             **UNITED STATES DISTRICT JUDGE**